667 So.2d 569 (1995)
Suzanne CHAUDOIR, et al., Plaintiffs-Appellees/Appellants,
v.
PORSCHE CARS OF NORTH AMERICA, et al., Defendants-Appellants/Appellee.
No. 95-729.
Court of Appeal of Louisiana, Third Circuit.
December 6, 1995.
Rehearing Denied February 26, 1996.
*572 Ralph W. Kennedy, Lloyd G. Teekell, Alexandria, for Suzanne L. Chaudoir et al.
Camilo K. Salas III, New Orleans, for Porsche Cars of North America Inc. et al.
Before YELVERTON and SULLIVAN, JJ., and KNIGHT[*], J. Pro Tem.
WILLIAM N. KNIGHT, Judge Pro Tem.
In this redhibitory action, Harris Chevrolet, Inc. appeals a judgment that rescinds the sale of a 1988 Porsche 928 S4; that grants nonpecuniary damages to the purchasers, Richard and Suzanne Chaudoir; and denies its claim for indemnification against Porsche Cars of North America, the American distributor of the vehicle. Also, the Chaudoirs appeal from the judgment that denies their claim under the "Lemon Law" against Porsche Cars of North America; that excluded the testimony of their automobile expert; and that awards them $2,500.00 in mental anguish and $15,000.00 in attorney's fees. Finding no error on the part of the trial court, we affirm.

FACTS
On December 2, 1989, plaintiffs, Richard and Suzanne Chaudoir, purchased a 1988 Porsche 928 S4 from Harris Chevrolet, Inc. (Harris), who had acquired the car from Porsche Cars of North America (PCNA), the American distributor for the German manufacturer, Porsche-AG. The Chaudoirs paid $67,245.55 for this 928 S4 which was "hand built" in Stuttgart, Germany, in the latter part of 1987. This vehicle is the top of the line production car manufactured by Porsche and is held out by Porsche to be one of the finest vehicles in the world.
The next day, Richard began to notice several problems with his Porsche. In particular, the rubber on the front and rear windshield wipers fell apart when he turned them on; the driver's side remote mirror did not work; the luggage cover was faded; one of the interior's lights was out; the floor mats and wheel locks were missing; the leather seats were dull; and when he shifted gears, there was a "clunk" noise in the transmission. As such, he brought the Porsche to Harris on December 12, 1989. The vehicle remained at Harris in its repair facility until December 14. At that time, all problems were corrected, with the exception of the transmission noise, which Harris could not duplicate.
Richard brought his Porsche back to Harris on January 29, 1990 complaining of a fuel leak. Harris removed and reinstalled the fitting on the fuel pump, which stopped the fuel leak. Also, Harris secured a loose connection on the vehicle's rear window wiper. Richard picked up his Porsche from Harris on February 2.
Richard did not return to Harris to have his Porsche serviced until September 25, 1990, about eight months from his previous service. At that time, he made the following complaints to Harris, namely: (1) the radiator cooling flaps were inoperable; (2) the right passenger seat, which was moved electrically, did not work; (3) there was an oil leak; (4) the air conditioner had not blown *573 cool air during the summer months; (5) the fuel and temperature gauges were erratic; (6) the weather stripping on the outside windows, which were made of rubber, were beginning to crack; (7) the hinges on the cassette storage compartment were beginning to crack; and (8) there was a leak in the sun roof. Harris corrected the oil leak by replacing an "O ring" that had rotted in the oil filter. Also, Harris replaced the "O ring expansion valve" in the air conditioner and recharged the system. When Richard returned to pick up his car on October 10, all of his complaints had been addressed and corrected by Harris.
However, only two days later, Richard brought the Porsche back to Harris complaining of a fuel leak. Richard told Brian Harris, the owner of Harris, that he wanted a "fresh" Porsche right "off the boat." Brian offered him a new Porsche in exchange for $35,000.00 and his 928 S4. Richard did not agree to this offer. After leaving Harris, Richard went out and purchased a 1991 Nissan Sentra. When he got his Porsche back from Harris on October 15, he parked it in the garage.
On October 25, Richard, again, brought his Porsche to Harris for additional repairs. He submitted the following complaints: the weather stripping around the windows had dry-rotted; both rubber type grommets around the windshield wiper motor had hardened and one was popping out; the plastic hinge on the cassette holder was brittle and partially broken; the temperature sensor on the dash was "flaking and crumbling"; the plastic covers on the rear speakers were splitting; the luggage cover was severely faded; the sun roof rattled; there was a strong smell of gasoline in the car; there was a roughness in the transmission when shifting gears; the leather seats were "heat and sun damaged"; the vinyl on the dash and doors were brittle and starting to break; the foam rubber under the hood was disintegrating and falling apart; the engine was running hot; and the rear air conditioner unit rattled. Harris could not verify Richard's complaints regarding the gasoline smell, the roughness in the transmission, and the problem with the engine running hot. Also, Harris ordered parts for the dash, door panels, speaker covers for the rear speakers, and the foam rubber under the hood. Further, Harris advised Richard that the leather seats needed to be treated. Harris addressed and corrected the rest of Richard's complaints, and he picked up the car on November 13, 1990.
On January 15, 1991, Richard and Suzanne filed suit against PCNA and Harris, asserting causes of action under redhibition and the Louisiana "Lemon Law." Harris answered, denying the Porsche contained any defects. However, Harris filed a third-party demand against PCNA, alleging that if there were defects, they were manufacturing defects and, as such, PCNA would be liable. PCNA answered the Chaudoirs' suit and Harris' third party demand, denying all claims against it.
A trial on the merits was held from August 23-26, 1994. Subsequently, the jury returned a verdict finding that: (1) the Porsche contained redhibitory defects at the time of sale; (2) the defects were sufficient to rescind the sale; (3) there were no manufacturing defects; (4) there was no violation of the "Lemon Law"; and (5) Harris was not entitled to a judgment on its third-party demand against PCNA. The jury awarded Richard and Suzanne damages of $77,000.00, mental anguish and inconvenience damages of $2,500.00, and attorney's fees of $15,000.00, subject to a credit for their use of the Porsche in the amount of $10,000.00.
On August 31, 1994, the trial court rendered judgment encompassing the jury's verdict. Harris then filed a Motion for Judgment Notwithstanding the Verdict or, alternatively, a Motion for a New Trial. The trial court denied both motions.
Harris appeals from the trial court's judgment and asserts that the jury erred in (1) denying its third-party demand against PCNA; (2) declining to enforce the contractual waiver of warranty; and (3) finding that it was a bad faith seller. Richard and Suzanne also appeal and assert that (1) the jury erred in denying their claims against PCNA; (2) the trial court erred in excluding the testimony of their expert witness; *574 and (3) the jury erred in awarding inadequate damages and attorney's fees.

LAW

HARRIS' APPEAL

I. HARRIS' THIRD-PARTY DEMAND AGAINST PCNA
Where a seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding right of action against the manufacturer of thing for any losses sustained by the seller. La.Civ. Code art. 2531. However, there are exceptions to this general rule. A seller has no right of indemnification from the manufacturer where the seller is at fault in creating defects or in failing to cure easily remediable defects. Dumond v. Houma Toyota, Inc. A.M.C. Jeep, Inc., 470 So.2d 484 (La.App. 1 Cir.1985). In order to succeed in an action for indemnification against the manufacturer, the seller must show that the manufacturer was the sole cause of the redhibitory defect for which the seller was cast in judgment. LaFrance v. Abraham Lincoln Mercury, Inc., 462 So.2d 1291 (La.App. 5 Cir.), writs denied, 467 So.2d 531, 532 (La.1985). In other words, liability for indemnity arises only when the party seeking indemnity, the indemnitee, is free from fault and has discharged a debt that should be wholly paid by the indemnitor. Klumpp v. XYZ Insurance, Co., 547 So.2d 391 (La.App. 3 Cir.), writ denied, 551 So.2d 1322 (La.1989).
In the case sub judice, the Porsche was completed in February 1988 in Stuttgart, Germany. PCNA acquired the vehicle from Porsche-AG and it arrived in the United States on April 1, 1988. The car was inspected by PCNA at its Pre-Delivery Inspection (PDI) facility in Charleston, North Carolina. According to the "Port To PDI Movement Form", PCNA found no defects in the Porsche. The vehicle was then sold to Harris on August 13, 1988.
When the Porsche arrived at Harris, it was inspected by Danny Fernia, who was employed by Harris to inspect all new cars. Fernia testified that he checked the outside and interior of the car. Fernia acknowledged that he did not "check the mechanical aspects" of the Porsche. He unequivocally stated that he found nothing wrong with the interior of the car. However, some "fall out" or acid rain dots were found on some parts of the Porsche by Harris' employees. Brian Harris testified that after an unsuccessful attempt to "buff-out" the spots, Wayne Avant, the PCNA representative, ordered the vehicle to be returned to PCNA's PDI facility for repairs.
After the Porsche was repaired, it was inspected again. A PCNA "Pre-Delivery Inspection Check List" dated October 6, 1988, revealed that the vehicle passed the inspection with the exception that a right headlight washer was not working, there were no operating manuals for the car, there were no spare keys, and the luggage cover had faded. PCNA corrected all of these problems. PCNA then returned the Porsche to Harris in October 1988. At that point, Brian Harris testified that he was "sure" that the Porsche was "fully inspected" again "for any damage." Harris accepted the vehicle and it was held out for sale to the public.
The record reveals that the Porsche remained at Harris from October 1988 until December 1989, when it was sold to the Chaudoirs. Robert Landry, who was the Porsche/Audi sales manager in 1989 for Harris, testified that the Porsche was kept in the two-car showroom and in an adjacent building during these fourteen months. Landry stated that the vehicle "would be occasionally brought out for display on the outside." However, on cross examination, Landry admitted that he gave a sworn statement on August 10, 1994, in which he acknowledged that the Porsche was kept outside during the day and then moved inside at night, except for some weekends when it was kept outside at night also.
Wolfgang Sanders, a field engineer with PCNA who was accepted by the trial court as an expert in repairs and mechanics in Porsche cars, unequivocally testified that PCNA sent technical bulletins to all of its dealers regarding the necessary procedures recommended by PCNA for "new vehicle storage." Specifically, the bulletin recommended that:

*575 Engine all: Seal the air intake ducts and the muffler tailpipe using towels or tape.
Vehicle Interior: The interior must be dry, especially in the area of the floor carpets. The use of drying agents (Silica-Gel) is recommended in vehicles with leather interior and in areas with high humidity. The recommended amount is 3 fabric bags of 500 grams each placed on the floor carpets. Windows, doors, lids and top must be closed. On cars with manual heating/ventilation systems, air flaps should be open.
Vehicles stored outdoors in direct sunlight: Precautions should be taken to prevent sunlight from entering the car's interior. Cover windshield, door, side and rear glass.
Putting vehicle in service: Remove intake duct and tailpipe sealing. Check for nesting creatures under the hood and evidence of fluid leaks under the car. Install battery. Start engine. Do not depress the accelerator pedal. Do not run engine at high RPM during warm up. Switch on A/C at idle RPM and check state of charge. Correct if necessary. Adjust tire pressure to specified pressure.
Harris introduced absolutely no evidence that any of PCNA's recommendations were followed during these fourteen months.
When the Chaudoirs purchased the Porsche, Richard stated that he noticed a "lack of freshness" in its leather seats. He testified that he put some Armor All on the seats trying to "freshen" them up. He admitted that he had read the Warranty and Maintenance book from Porsche which recommended a "leather preservative." At trial, Richard testified that his Porsche was "kind of like a pretty girl who's been burned or scold [sic]." He further stated that the Porsche, at the time of trial, had the following problems, namely: all the leather seats were hard and sun damaged; the dash was cracked; the side door panels were cracked; the air conditioner did not work; and the car would not start without jumper cables.
Sanders, who examined the Porsche on behalf of PCNA on July 17, 1994, testified that the air conditioner did not work because a "safety switch" was preventing the system from coming on. Sanders noted that the switch would come on when the unit was low on Freon to prevent the compressor from getting damaged. He indicated that the only repair needed would be to add Freon to the unit. He pointed out that it is normal for Freon to leak when the air conditioner is not used for a period of time.
Regarding the Chaudoirs' problem starting the car, Sanders testified that the battery was discharged. However, he stated that the battery in the car was not a Porsche battery. He noted that the battery he found was a "standard part store battery for a domestic car." Finally, he indicated that he "couldn't make any judgments as to whether there was some kind of mechanical problem, whether simply from having the incorrect battery and no use of the car."
After examining the interior of the Porsche, Sanders testified that "all surfaces show signs of long-term heat and sun exposure" and that he "could not see, feel, smell any signs of leather or vinyl protectant applied." Further, Robert Descant, the Chaudoirs' expert in upholstery, opined that the damage to the interior of the Porsche was caused by overexposure to the sun. Descant also stated that he could find no manufacturing defects in the Porsche. Additionally, Richard Dale Kyle, the Chaudoirs' expert in automobile collision repair, testified that the damage to the interior had been caused by the heat. Finally, Richard admitted that he did not consult with any mechanical experts before filing suit.
All three experts testified that there were no manufacturing defects in the Porsche. Also, the Chaudoirs and Harris failed to present any type of evidence that indicated that the Porsche had manufacturing defects. Instead, the record substantiates that the Porsche was kept outside in the elements for approximately fourteen months. Further, the record reveals that Harris failed to properly maintain the Porsche prior to the sale to the Chaudoirs. Therefore, Harris is at fault for at least some of the defects in the Porsche. Thus, we conclude that the jury did not err in failing to grant indemnity to *576 Harris. See Wheeler v. Clearview Dodge Sales, 462 So.2d 1298 (La.App. 5 Cir.1985).

II. WAIVER OF WARRANTY
Harris argues there was a "Disclaimer of Warranties" on the sales contract, therefore, the Chaudoirs waived any rights that they may have had to assert Harris breached any express or implied warranties in the Porsche.
The Chaudoirs, on the other hand, assert that the waiver of warranties was not effective because Harris' employees did not call it to their attention nor explain it to them. We agree.
Every sale in this state carries with it the legal warranty that the thing sold is free from hidden defects or redhibitory vices. Guillory v. Morein Motor Company, Inc., 322 So.2d 375 (La.App. 3 Cir.1975). However, this warranty may be waived by the buyer. Id. In order to be effective, such waiver of warranty must satisfy three requirements: (1) be written in clear and unambiguous terms; (2) be contained in the contract; and (3) either brought to the attention of the buyer or explained to him. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La.1973). The seller has the burden of proving that the applicable warranties were waived. Jofforion v. Leglue Buick, Inc., 399 So.2d 762 (La.App. 3 Cir.1981). Whether there is an effective waiver of warranty is a question of fact that will not be disturbed by an appellate court in the absence of manifest error. Linch International Trucks, Inc. v. Pierre, 434 So.2d 1225 (La.App. 1 Cir.1983).
The record reveals that the waiver of warranty was clear and unambiguous and was located on the sales contract that Richard signed on the night he purchased the Porsche. However, the record substantiates that the Chaudoirs and Harris' salesman were in a rush to complete the sale since it was around 8:00 p.m. on a Saturday night. Further, all Harris' office personnel had left around 5:00 p.m. Harris' salesman attempted to type some of the paper work involved in the purchase, however, he abandoned that attempt because he could not type. Since the hour was late and the Chaudoirs had their young daughter with them, the Chaudoirs signed a series of blank documents to be filled in later by the office personnel and then shipped to them. There is no evidence in the record that Harris' salesman either brought the waiver to the attention of the Chaudoirs or explained it to them. The undisputed testimony of the Chaudoirs indicated that Harris' salesman did not bring the waiver to their attention or explain it to them during the rushed attempt to complete the sale. Thus, we conclude that the jury was not manifestly erroneous in finding that the waiver of warranty was not effective. See Vercher v. Ford Motor Company, 527 So.2d 995 (La.App. 3 Cir.1988); Washington v. Morein Motor Co., Inc., 488 So.2d 325 (La. App. 3 Cir.1986).

III. BAD FAITH
Harris argues that it had no knowledge of the defects in the Porsche at the time of the sale, therefore, the award of attorney's fees and damages was inappropriate.
The Chaudoirs assert that Harris knew that the Porsche had been damaged by acid rain and subsequently repainted by PCNA. They argue that this information was never revealed to them by Harris at the time of the sale. Therefore, the Chaudoirs insist that Harris was a bad faith seller. After a thorough review of the relevant facts, we agree.
A seller, who knows of the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of expenses, including reasonable attorney's fees, is answerable to the buyer in damages. La.Civ.Code art. 2545. Whether a seller is in bad faith is a question of fact, Smith v. Max Thieme Chevrolet Company, Inc., 315 So.2d 82 (La.App. 2 Cir.1975), and an appellate court may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La. 1993).
As previously stated, portions of the paint on the Porsche had been damaged by acid rain prior to its arrival at Harris. PCNA subsequently repainted the parts of the vehicle that had been damaged and *577 shipped it back to Harris. Richard Dale Kyle, the Chaudoirs' expert in automobile collision repair, testified that there were "imperfections in the paint work" and that the hood, both front fenders, and the rear hatch had been repainted. Wayne Avant, the PCNA service manager, testified that it was up to the dealer to disclose if a car had damage. Avant stated that dealers would not have to disclose minor damages that had been repaired prior to the sale such as "scratches or little scrapes" that "are just brushed touched, or polished out." However, Avant noted that the acid rain damage in the Porsche was "not minor because it was very obvious." The Chaudoirs both unequivocally testified that Harris' employees never told them that their car had been damaged by acid rain and subsequently repainted. Brian Harris admitted that he didn't know if the Chaudoirs were advised of the acid rain damage. Thus, we conclude that the jury was not manifestly erroneous in finding that Harris was a bad faith seller. See Vercher, 527 So.2d 995.
Notwithstanding, Harris argues that the Chaudoirs were not entitled to damages because the purchase of the Porsche was not intended to gratify some nonpecuniary interest.
In Young v. Ford Motor Co., Inc., 595 So.2d 1123, 1133 (La.1992), the Louisiana Supreme Court stated:
Thus, under Article 1998, which is the controlling article for the type of damages referred to by the redhibition articles (specifically Article 2545), if it can be established that the obligee intendedand if the nature of the contract supports this contentionto gratify a significant nonpecuniary interest by way of the contract, and that the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, then the requirements for recovery of nonpecuniary damages are satisfied.
Although purchase of a new truck or car may be prompted by both the pecuniary interest of securing transportation and the nonpecuniary interest relating to enjoyment, taste, and personal preference of owning and driving the chosen vehicle, the nature of the contract is primarily pecuniary (unless other factors evidence a different conclusion). Contrast the contract of purchase made in a standard new car sale with a purchase of an antique car that, while it might be driven on the streets, represents the obligee's desire to own, and perhaps to show, a distinctive, unique automobile. Or, contrast the traditional new car purchase with a contract for a specially-designed, custom-built vehicle. [Footnote Omitted.]
In the case sub judice, the Chaudoirs purchased the top of the line, "hand built" production car from Porsche. This was obviously not a "standard new car sale." Suzanne testified as to the reason that they decided to purchase the Porsche:
A. Notin length of talking, but to explain that I know my husband's history. I know that we're both sort of similar circumstances. We grew up poor. I know how hard he worked throughout high school. In fact, he started working grade school. He worked almost full-time in high school. Almost full time in college while taking more than an average load. Eight years, seven summers, immediate work after that. Since we've opened our own business, we've never had a forty-hour week. Our weeks are more like fifty, sixty, seventy hours a week of working together. Knowing all that, I guess what I wanted to do is to have my husband have some kind of award.
Q. Who proposed that, uh, originally, the idea to purchase this vehicle?
A. Well, Ipossibly was in both of minds. There's nothing that my husband would take personally as the way of, he's not a jewelry person. He's not an expensive clothes person. He has no hobbies. He doesn't hunt. He doesn't fish. He does family things. But in probably late summer of '89, he was reading an article out of a Washington State news paper. It was describing one of their top attorneys who was a trial attorney who had purchased and absolutely loved his Porsche. I think it was a Targa. It was a convertible type. I think I noticed some longing or envy, jealous, whatever, you know, in my husband *578 at that time. I know he loved cars. He's always wanted us to have a safe vehicle to be in. So we have had cars.
Q. Okay.
A. Knowing that, also, him I guess rewarding me for a lot of hours of work, he wanted me to have the nice lady type family car. So he purchased a Town Car for me. I think it was just like a joint `Why don't we make this commitment. We're going to work. We're going to allow our daughter to grow up here. Let's spend some of the money we worked hard for. Let's enjoy what we worked for.'
Richard also explained why he wanted a Porsche:
I may go back to the James Dean days. But I always, even when I was in college, always thought that if you're goingif you're going to have the ultimate automobile, you would have a Porsche. I don't know where that comes from, other than maybe I was born with that feeling. But I always felt that, you go buy a Porsche, you've got something that nobody else has, basically.
We find that the purchase of a "hand built," top of the line performance car which is held out to be the "finest car in the world," satisfies the requirements of La.Civ.Code art. 1998. Consequently, we find no error in the jury's assessment of damages for mental anguish.

CHAUDOIRS' APPEAL

I. LEMON LAW
The Chaudoirs argue that the jury erred in denying their claim under the "Lemon Law" against PCNA. We disagree.
The law regarding warranties for new motor vehicles is found in La.R.S. 51:1941 et seq., and these statutes are commonly referred to as the Louisiana "Lemon Law." La.R.S. 51:1942, which sets forth the duty of a manufacturer or its authorized dealer to repair a new motor vehicle, states:
If a new motor vehicle does not conform to an applicable express warranty, and the consumer reports the nonconformity to the manufacturer or any of its authorized motor vehicle dealers and makes the motor vehicle available for repair before the expiration of the warranty or during a period of one year following the date of the original delivery of the motor vehicle to a consumer, whichever is the earlier date, the manufacturer, its agent, or its authorized dealer shall make such repairs as are necessary to conform the vehicle to such warranty, notwithstanding the fact that such repairs are made after the expiration of such terms or such one-year period.
La.R.S. 51:1943, which governs the time in which the manufacturer or its authorized dealer must conform the new motor vehicle to express warranties, states, in pertinent part, that:
It shall be presumed that a reasonable number of attempts have been undertaken to conform a motor vehicle to the applicable express warranties if the vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days or the same nonconformity has been subject to repair four or more times by the manufacturer, its agent, or its authorized dealer within the warranty term or during a period of one year following the date of the original delivery of the motor vehicle to the consumer, whichever is the earlier date.
The liability of a manufacturer or its authorized dealer to the buyer when it is unable to conform the motor vehicle to the applicable express warranties is set forth in La.R.S. 51:1944, which provides, in pertinent part, that:
If after four or more attempts within the express warranty term or during a period of one year following the date of the original delivery of the motor vehicle to the consumer, whichever is the earlier, the nonconformity has not been repaired or if the vehicle is out of service by reason of repair for a cumulative total of thirty or more calender days during the warranty period, the manufacturer shall:
(1) Replace the motor vehicle with a comparable new motor vehicle, or, at its option,
(2) Accept return of the motor vehicle and refund the full purchase price plus any amounts paid by the consumer at the point *579 of sale, and all collateral costs less a reasonable allowance for use to the consumer, or any holder of a perfected security interest in the motor vehicle, as their interest may appear, if the transaction was a sale.
The "nonconformity" refers to any specific or generic defect or malfunction, or any defect or condition which substantially impairs the use and/or market value of the motor vehicle. La.R.S. 51:1941.
The record reveals that on October 12, 1990, Richard became upset with Brian Harris after Harris offered him a new Porsche in exchange for the one that he had and $35,000.00. At that point, Richard unequivocally testified that he "had kind of just been had" and that the conversation with Harris "probably ended the romance." After leaving Harris, Richard purchased a 1991 Nissan Sentra and parked his Porsche in the garage. On October 16, 1990, Richard wrote a letter to Brian Harris with a carbon copy to Linda Walker, a representative of PCNA, in which he revealed that he had parked his Porsche in his garage because of the many problems he was having with it. Specifically, he stated, in part, that:
I have discussed this matter with my attorney, Mr. Thomas R. Willson, 1330 Jackson Street, Alexandria, Louisiana 71303, and we are of the opinion that the defects, malfunctions and conditions result from nonconformity of the vehicle with express warranties. Therefore, I tender the return of the vehicle to you and/or Porsche Cars North America, Inc. And stand ready to execute the Certificate of Title with all necessary endorsements to transfer same pursuant to LSA R.S. 51:1941, et seq.
It is clear that by October 16, Richard no longer had an interest in having the vehicle repaired and that he wanted a new Porsche. The record substantiates that the Porsche was in the repair shop at Harris for only twenty-four days as of October 16. Therefore, under the particular facts in this case, the Chaudoirs failed to prove that the Porsche was "out of service" for thirty or more calendar days "by reason of repair." Thus, we conclude that the jury was not manifestly erroneous in finding that the Chaudoirs failed to prove that they were entitled to relief under the provisions of La.R.S. 51:1941 et seq. See Vincent v. Hyundai Corporation, 633 So.2d 240 (La. App. 1 Cir.1993), writ denied, 93-C-3118 (La.2/11/94), 634 So.2d 832.

II. EXCLUSION OF EXPERT TESTIMONY
The Chaudoirs argue that the trial court erred in excluding the testimony of their automobile expert, Tony Boatwright. We disagree.
A trial court has the power to require that the proceedings be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done. La.Code Civ.P. art. 1631. A trial judge has great discretion in the manner in which proceedings are conducted before his court and it is only upon a showing of gross abuse of discretion that appellate courts have intervened. Pino v. Gauthier, 633 So.2d 638 (La.App. 1 Cir.1993), writs denied, 94-C-0260 (La.3/18/94), 634 So.2d 858, 859.
As previously stated, the Chaudoirs filed this suit on January 15, 1991. Trial on the merits was set for August 23, 1994. PCNA first received notice that the Chaudoirs planned to use Tony Boatwright as an expert witness on July 21, 1994, when they filed an amended list of witnesses they planned to call at trial. PCNA scheduled to take Boatwright's deposition on August 22, the day before trial, at 3:00 p.m. On August 22, during the morning hours, PCNA's attorney received a call from the Chaudoirs' attorney that Boatwright could not make the deposition in Alexandria. However, later that afternoon, PCNA's attorney, who was in New Orleans, received notice that Boatwright could be made available in Alexandria at 5:00 p.m. Since this was the evening before the trial began, PCNA's attorney filed a Motion In Limine to exclude Boatwright's testimony. After hearing the arguments, the trial judge held:
I would say this. Since this case has been filed and with the length of time we have *580 had forgentlemen, you have had for complete discovery, that under the circumstances, it would be unfair to the defense to come forward with Mr. Boatwright at the eleventh hour, and I will not allow him to testify.
We conclude that the trial court did not abuse its discretion in excluding the testimony of Boatwright.

III. DAMAGES AND ATTORNEY'S FEES
First, the Chaudoirs argue that the jury's award of $2,500.00 for mental anguish was inadequate.
In the assessment of damages, much discretion is afforded to the judge or jury, and upon appellate review, such awards will be disturbed only when there has been a clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993). In fact, the discretion vested in the trier of fact in awarding general damages is "great, and even vast" so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Only when the award is, in either direction, beyond which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should reduce or increase the award. Id.
In the case sub judice, Richard summarized his feelings regarding his experience with the Porsche:
Distress. Disgust. Every day I walk out of my house, I see it and, if it's in the summer, I smell it. Every day when I come into my house, I see it and I smell it. Anytime I'm in my yard with my garage doors open, I see it. I see Seventy Thousand Dollars sitting there for almost five years, and not once has anybody said, `Hey, we'll work with you on this thing.'
Suzanne testified that during the problems with the Porsche, she noticed that her husband had a lack of sleep and concentration, and that the car "was a worry." Finally, she stated that the performance from the Porsche was a "huge disappointment."
While the award may be at the lower end of the scale, we cannot say that the jury abused its "great, and even vast" discretion in awarding the Chaudoirs $2,500.00 for mental anguish.
Finally, the Chaudoirs assert that the award of $15,000.00 in attorney's fees was inadequate.
Before an appellate court will disturb an award by the trial court of attorney's fees and expenses, the record must clearly reveal that the trier of fact abused its much discretion in making that award. Domite v. Imperial Trading Co., Inc., No. 94-16 (La.App. 3 Cir. 8/3/94), 641 So.2d 715. Factors that are to be considered in determining attorney's fees in a redhibition case are (1) the responsibility incurred; (2) the nature and extent of the work performed; (3) the legal knowledge and skill of counsel; and (4) the amount of the claim and the amount recovered for the plaintiff. Buteau v. Leleux, 591 So.2d 1261 (La.App. 3 Cir.1991).
The record reveals that the Chaudoirs' attorney made eight court appearances before the trial on the merits regarding various exceptions and summary judgment motions filed by the defendants; conducted extensive discovery; conducted meetings with the Chaudoirs and the defendants' attorneys; prepared a pre-trial memorandum; participated in a four-day trial on the merits; and made an appearance on two post trial motions. Also, the Chaudoirs' attorney was successful in their claim against Harris. The Chaudoirs' attorney introduced into evidence his employment contract which provided a contingency fee on one-third of the amount of recovery, which was $69,500.00. While the attorney's fees calculated under the contingency contract would have warranted a larger award, we cannot conclude that the jury abused its much discretion in awarding the Chaudoirs $15,000.00 in attorney's fees.

CONCLUSION
For the foregoing reason, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally against Richard *581 and Suzanne Chaudoir and Harris Chevrolet, Inc.
AFFIRMED.
NOTES
[*] Judge William N. Knight of the Thirty-first Judicial District Court participated in this decision as a Judge Pro Tempore by appointment of the Louisiana Supreme Court.