772 So.2d 133 (2000)
Pamela LeBLANC and C.J. LeBlanc, et al.
v.
ST. PAUL FIRE AND MARINE INS. CO., et al.
No. 99-2008.
Court of Appeal of Louisiana, Third Circuit.
September 6, 2000.
Writ Denied November 27, 2000.
*134 Todd Townsley, Lake Charles, LA, for Plaintiffs-Appellees.
Richard Cappel, Lake Charles, LA, for Defendant-Appellant.
Court composed of NED E. DOUCET, Chief Judge, SYLVIA R. COOKS, and JOHN D. SAUNDERS.
COOKS, Judge.
The Louisiana Patient's Compensation Fund appeals a judgment against it in the amount of $591,321.29. It alleges the trial court erred in finding in favor of appellee and denying its Motion in Limine to exclude certain expert testimony. the foregoing reasons, we affirm the trial court's judgment.

FACTS
This case involves a medical malpractice action against Dr. John B. Caire and the Louisiana Patient's Compensation Fund. Dr. Caire specializes in obstetrics and gynecology. also provides medical services to assist his patients in weight control and reduction. Appellee, Pamela LeBlanc, was dissatisfied with her weight and sought treatment from Dr. Caire. On her first visit, in April of 1995, LeBlanc was placed in a group with approximately 8-10 patients. An employee in Dr. Caire's office determined the patients' blood pressure, briefly discussed eating habits, passed out a fat gram book, and a pamphlet regarding the importance of water and exercise. Following a brief lecture, the patients were taken to Dr. Caire's office.
*135 The patients were not separated. They sat in a group around Dr. Caire's desk while he questioned each of them about their weight loss goals. After each patient discussed her objective, the doctor allowed the patient to determine the strength of her medication. He asked her whether she wanted strong, medium, or mild pills. He did not counsel any patient on the risks associated with taking the prescribed medication.
Dr. Caire prescribed two pills for Le-Blanc, Phentermine and dessicated hormone. Phentermine is an appetite suppressant commonly prescribed to patients attempting to lose weight. Dessicated hormone, however, is commonly referred to as slaughter house thyroid hormone because it is extracted from slaughter house animals.
Title 46 of the Louisiana Administrative Code, Professional and Occupational Standards, Part I, Chapter 69, Subpart 3, makes it unlawful for any physician to prescribe dessicated hormone for weight loss purposes. Sub-parts (D) & (E) of Title 46 also makes it unlawful for a physician to prescribe Phentermine for more than 12 weeks in a one year period.
Dr. Caire prescribed the hormone supplement to LeBlanc without informing her of its potential risks. Dr. Caire also failed to perform any laboratory test to determine the condition of LeBlanc's thyroid; and, he did not investigate LeBlanc's medical history nor perform a physical examination on her.
LeBlanc returned to Dr. Caire's office on a monthly basis. She testified nonmedical staff refilled her prescription and recorded her weight. She saw Dr. Caire only twice in six months, and neither time did he examine her thyroid. Dr. Caire confirmed prescribing Phentermine for LeBlanc's use in conjunction with the hormone supplement for a period exceeding the annual duration statutorily authorized.
In September of 1995, Dr. Caire increased LeBlanc's hormone dosage because she complained of not losing weight. Again, he failed to warn her of the serious risks associated with the use of the hormone, particularly when taken in conjunction with Phentermine. On her last visit, LeBlanc bought 100 of the stronger dose pills. But shortly thereafter, she began to experience "a scratchy and irritated feeling" in her eyes. Her left eye eventually became swollen with mucus and discharge. first, LeBlanc believed the condition resulted from "pink eye," but her symptoms persisted; and, she scheduled an appointment with Dr. Liwliwa Ramos, an internal medicine physician.
Dr. Ramos prescribed eye drops for Le-Blanc's use. The drops, however, did not solve the problem. doctor recommended that LeBlanc visit Dr. Kenneth Harper, an ophthalmologist. Dr. Harper ran several tests and diagnosed LeBlanc with having Grave's Disease. January of 1996, he concluded her condition resulted from the dessicated hormone which he suggested she discontinue using immediately. also instructed her to return to Dr. Ramos for further testing. One day later, Dr. Ramos did a thyroid profile which confirmed Dr. Harper's diagnosis. Ramos noted her thyroid was extremely abnormal. sought another opinion from Dr. Lee Schwalben, an internal medicine specialist. After performing several tests, Dr. Schwalben also confirmed LeBlanc was suffering from Grave's Disease and stated the condition resulted from the use of dessicated hormone supplement.
LeBlanc's condition grew worse. In addition to the itchy, swelling eye symptoms, she began experiencing hot flashes and nervousness. Dr. Harper referred her to Drs. Mazow and Wilkins of the Houston Eye Associates. In an effort to control the swelling, Dr. Wilkins prescribed LeBlanc huge doses of Prednisode, a steroid drug. He, like the other doctors, believed her problems resulted from the use of the hormone supplement. LeBlanc's left eye grew worse, eventually protruding out of the eye socket and then pointing downward. She experienced difficulty seeing. Dr. Mazos recommended surgery. In November *136 of 1996, LeBlanc underwent Strabismus surgery on the left eye. A few months later, in February of 1997, she underwent orbital decompressions in both eyes and a third surgery the following November.
Despite three surgeries, LeBlanc's condition persists. She has permanent double vision, depth perception problems and sensitivity to air blowing directly into her eyes. Both eyes "bulge out" and her appearance has dramatically changed. Le-Blanc quit her job as an x-ray technician to avoid further exposure to radiation, noting the three surgeries she underwent required radiation treatments. For the rest of her life, she will require medication to regulate her thyroid.
LeBlanc filed a malpractice suit against Dr. Caire, individually, and on behalf of her husband and minor children for damages sustained. As required under Louisiana's Medical Malpractice Act, La.R.S. 40:1299.41 et seq., the claim was submitted first to a medical review panel before any action could be filed. La.R.S. 40:1299.47. The panel unanimously concluded Dr. Caire should have performed blood tests and/or thyroid tests when he prescribed the dessicated hormone for LeBlanc's use. However, the panel did not find the evidence it reviewed proved the hormone supplement caused or contributed to Le-Blanc's Grave's Disease.
LeBlanc then filed suit. A jury rendered a verdict against Dr. Caire and the Louisiana Patient's Compensation Fund (the Fund) in the following amounts:
Pamela LeBlanc $250,000 for physical and mental
 pain and suffering and loss of enjoyment
 of life (past and future)
 $31,321.29 past medical expenses
 and $50,000 for future medical expenses;
 disability;
 $100,000 for permanent or partial
 disability;
 $100,000 for disfigurement;
C.J. LeBlanc $20,000 for loss of consortium
 claim
Joseph LeBlanc $20,000 for loss of consortium
 claim
Wade LeBlanc $20,000 for loss of consortium
 claim
The total judgment was for $591,321.29, minus a credit in the amount of $100,000.00.
The Fund lodged this appeal, asserting the following assignments of error:
(1) The trial court erred in denying the defendant's Motion in Limine to exclude portions of Dr. Harper's testimony.
(2) The trial court erred in excluding the testimony of the defense rebuttal witnesses, Dr. Larry Stewart, Dr. Mixon and Dr. Clinton Hart.
(3) The jury erred in finding that the alleged deviation from the appropriate standard of care by Dr. Caire was a legal cause in fact of the plaintiffs development of Grave's Disease and exophthalmos as there exists no reasonable basis for this decision.
(4) The trial court erred in instructing the jury that plaintiffs disability was presumed to have resulted from Dr. Caire's alleged malpractice.
(5) Alternatively, the amount of damages awarded was excessive.

MOTION IN LIMINE
In its first assignment of error, the Fund contends the trial court erred in denying its Motion in Limine seeking to exclude certain portions of Dr. Harper's testimony. Specifically, the Fund argues Dr. Harper did not possess the medical expertise to testify on whether dessicated hormone causes Grave's Disease with associated exophthalmos.
The United States Supreme Court in Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), sets forth the standard for determining whether an expert's testimony is admissible. According to Daubert, the trial court must consider 1) the qualifications of the expert; 2) the reliability of the expert testimony; 3) the helpfulness *137 of the testimony to the trier of fact; and 4) the prejudicial effect of the testimony. In this case, the trial court concluded Dr. Harper's testimony satisfied the Daubert requirements.
The trial court examined Dr. Harper's qualifications. He was tendered as an expert in the field of ophthalmology. The field of ophthalmology encompasses surgical and medical treatment of any and all eye disorders. Dr. Harper is an assistant clinical professor of ophthalmology at LSU Medical School in New Orleans. He testified he diagnoses and treats individuals who suffer from thyroid related eye problems.
The jurisprudence requires the trier of fact to act in a "gate keeping" capacity to ensure that expert testimony is both relevant and reliable. Sandell v. Hooter, 96-1062 (La.App. 3 Cir. 2/26/97); 692 So.2d 474, writ denied, 97-0801 (La.5/1/97); 693 So.2d 730. In denying the Motion in Limine the trial court specifically found Dr. Harper's anticipated testimony was reliable. Since 1980, Dr. Harper has treated seven other patients who, while taking dessicated hormone, developed Grave's Disease with associated exophthalmos. We find Dr. Harper's testimony was reliable, probative and aided the jury in reaching its decision. The trial court did not err in finding Dr. Harper met the Daubert criteria for admissibility of his expert testimony.

EXCLUSION OF REBUTTAL WITNESSES
Within days of the September 7, 1999 trial, the Fund attempted to add additional witnesses to its pretrial list previously submitted to rebut Dr. Harper's testimony. Specifically, it sought to use the testimonies of Dr.'s Hart, Mixon, and Stewart to establish that supplemental thyroid therapy does not cause Grave's Disease. In its Pre-Trial Order, the trial court informed counsel that the parties were to exchange witness lists by August 6, 1999. The Fund did not list Dr.'s Hart, Mixon, or Stewart on the witness list provided to LeBlanc's counsel.
Contending it did not have time to sufficiently depose these witnesses, counsel for LeBlanc moved to exclude the witnesses. The trial court granted the motion and stated the following:
I've got to agree that the bringing three doctors at this late date in a medical malpractice case to use as witnesses who haven't been identified in prior discovery or on the pretrial order information, with no opportunity for him to depose them, I am not going to allow them to testify.
A trial judge has great discretion in the manner in which proceedings are conducted before his court and it is only upon a showing of gross abuse of discretion that appellate courts will intervene. La.Code Civ.P. art. 1631; Chaudoir v. Porsche Cars of North America, 95-729 (La.App. 3 Cir. 12/6/95); 667 So.2d 569, writ denied, 96-800 (La.5/31/96); 673 So.2d 1033; Pino v. Gauthier, 633 So.2d 638 (La.App. 1 Cir. 1993), writ denied, 94-C-0260 (La. 3/18/94); 634 So.2d 858, 859. The trial court did not abuse its vast discretion in excluding the testimony of the defendant's witnesses.

STANDARD OF CARE
In its third assignment of error, the Fund contends LeBlanc failed to prove Dr. Caire's alleged malpractice was the cause-in-fact of her injuries. The law imposes a duty on a patient to prove a causal connection between a doctor's alleged negligent conduct and their injury. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). In this case, the jury believed LeBlanc and the evidence she presented regarding the causal link between dessicated hormone and graves disease. We note the jury's findings are determinations of fact which will not be reversed on appeal, absent manifest error. La.R.S. 9:2794.
*138 Plaintiffs in medical malpractice actions must establish their claim by a preponderance of the evidence. A plaintiff must prove that 1) a doctor's treatment fell below the ordinary standard of care required of physicians in his or her medical specialty and 2) a causal relationship exists between the alleged negligent treatment and the injury sustained. Martin, 582 So.2d 1272 (La.1991). We recognize, however, that physicians are not held to a standard of absolute precision, but the conduct must not fall below the care ordinarily expected of a physician practicing his or her medical specialty. Broadway v. St. Paul Ins., Co., 582 So.2d 1368 (La.App. 2 Cir.1991).
Here, it is undisputed that Dr. Caire failed to exercise the ordinary standard of care applicable to the specialty he practiced. He prescribed LeBlanc dessicated hormone for weight loss in violation of Title 46. Furthermore, he failed to conduct an analysis of LeBlanc's medical history, run lab tests on her, or perform a thyroid work-up. Even the Medical Review Panel found, "[t]he evidence supports the conclusion that the defendant, Dr. John B. Caire, failed to comply with the appropriate standard of care as charged in the complaint ..." Further, when asked whether Dr. Caire's conduct fell below the ordinary standard of care, Dr. Gordon, the Fund's expert, stated:
... that's not exactly what I would do. My training and my feeling has been that you are really better off checking the patient's for these various conditions before you start treatment, and that would be the general experience of most internists and most endocrinologists in looking at this ...
We cannot say the jury manifestly erred in concluding Doctor Caire's treatment fell below the ordinary standard of care required of physicians practicing in his medical specialty.
But LeBlanc must also show Dr. Caire's wrongful conduct was a cause in fact of her developing Grave's Disease. The cause in fact inquiry may be satisfied by asking "but for" the defendant's conduct, would the plaintiff have suffered her injuries. Ardoin v. Hartford Accident & Life Indem. Co., 360 So.2d 1331 (La.1978). Several physicians rendered opinions on this issue, but their testimonies are conflicting.
The Fund's expert (Dr. Gordon) testified Grave's Disease is caused by an antibody which stimulates the thyroid gland and thereby causes it to overreact. The overreaction causes the thyroid gland to swell, become enlarged, and produce excessive hormones, which precipitates a condition known as hyperthyroidism or thyroid toxicosis. The hyperthyroidism, in turn, may cause (as in LeBlanc's case) the tissue behind the eye to enlarge and produce a protrusion of the eyeball (exophthalmos).
Dr. Gordon testified, in his opinion, doctors are really unsure of the exact etiology of Graves Disease or its triggering mechanisms. But he admitted when he treats obese patients for weight loss, he does not prescribe thyroid medications.
Dr. Silverberg, another endocrinologist, first testified the medical literature does not causally link dessicated hormone and Grave's Disease. However, on cross examination, he retracted this statement, and admitted the literature suggests such a connection exists. Dr. Silverberg also testified drugs may trigger Grave's Disease, but he qualified this acknowledgment by stating such occurrences are unlikely.
Dr. Harper, the ophthalmologist who first diagnosed LeBlanc's condition, testified when asked:
Q. Explain to the jury how the thyroid hormone, in not only Pamela LeBlanc, but these other patients, you believe contributed to this eye problem.
A. Well, we're not really sure of the exact link between thyroid hormones or hyperthyroidism and grave's disease; but I think several physicians feel that there's some sort of a connection between hyperthyroidism, or whichever *139 way it happens, whether it occurs naturally or as a result of taking excessive thyroid. But there seems to be a connection between the development of Grave's Disease and hyperthyroidism.
Q. Now, it'sit's a scientific fact, is it not, that the thyroid hormone, when given to a hyperthyroid patient, can lead to hyperthyroidism; correct?
A. Yes.
Q. And it can cause a toxic effect on the thyroid; correct?
A. Well, it causes a toxic effecttoxic effect on the whole body.
Q. And you believe that's what happened with Ms. LeBlanc; correct?
A. Yes.
Q. Now, explain to the jury how that desiccated thyroid gets into her system and causes the kind of thyroid problem, which would lead to an eye problem. How does it affect the TSH, or the T3-4, and then, how does that substance cause an eye problem?
A. Well, the desiccated thyroid can cause an elevation in her thyroid functions, the T3 and T4, and would probably suppress the TSH. That's the thyroid stimulating hormone.
Q. And how does it affect the eyes?
A. There seems to be a substance that's secreted called "LATSH", which stands for long-acting thyroid stimulating hormone, which can lead to a production of a chemical substance called "mucopolysaccharide", This substance is deposited in the orbital tissues, and when this happens, it attracts water to the orbits, causing massive swelling and thickening of the muscles that control the movement of the eye.
While Dr. Harper stated the exact cause of Grave's Disease is questionable, he was certain the dessicated hormone given to LeBlanc caused a toxic effect in her whole body which led to her developing hyperthyroidism; and, as he stated "there seems to be a connection between the development of Grave's Disease and hyperthyroidism." Dr. Harper was so convinced that the dessicated hormone prescribed in this instance caused LeBlanc's eye problems, he wrote a personal letter to Dr. Caire informing him of his conclusion.
Dr. Schwalben, a board certified internal medicine specialist, also supported Dr. Harper's opinion. When questioned about LeBlanc's condition, he stated the following:
Q. Dr. Schwalben, can dessicated thyroid cause a patient who had a normal thyroid before they took it to become hyperthyroid?
A. Well, there's at least a transient hyperthyroid state because if you give somebody who is euthyroid, in other words, has a normal amount of hormone circulating in their body, and you dump more hormone in, at least for a period of time you're going to adjust to it.
Q. And the medical literature clearly states that dessicated thyroid like this can cause a normal patient in good health to become hyperthyroid after taking it; correct?
A. Yes.
Q. Particularly when taking it chronologically over a long period of time; right?
A. Well, you chronologically suppress the gland, and it depends on how much youit depends on the activity of the dessicated thyroid, yes.
* * * * * *
Q. All right. And in this particular case with Ms. LeBlanc, do you believe more probable than not that the slaughterhouse thyroid that Dr. Caire gave her was the triggering mechanism for her Graves' Disease and exophthalmus?
A. Well, in the very least, I think the combination of Phentermine and the thyroid, the dessicated thyroid, is most likely the cause of her Grave's Disease.
* * * * * *
Q. And any problems that she continues to have with her vision as a result of those surgeries, her continuing problems *140 also are a direct result of Dr. Caire's substandard treatment?
A. Yes.
The jury evaluated each physician's testimony and concluded that more likely than not, Dr. Caire's negligence was a cause in fact of LeBlanc's harm. When there is conflicting testimony among medical experts, we give great deference to the jury's resolution of the conflicting evidence. Landeche v. McSwain, 96-959 (La. App. 4 Cir. 2/5/97); 688 So.2d 1303, writ denied, 97-557 (La.5/1/97); 693 So.2d 741; Butts v. Cummings, 488 So.2d 1169 (La. App. 2 Cir.), writ denied, 494 So.2d 327 (La.1986). We believe the jury's finding is reasonable and supported by the testimony when reviewed in whole.

JURY INSTRUCTION
The Fund contends since there was no reasonable possibility of a causal connection between plaintiff's development of Grave's Disease and Dr. Caire's alleged malpractice, the trial court erred in instructing the jury that there was a "presumption" the alleged disability resulted from the ingestion of dessicated hormone. We have briefly entertained the Fund's rather circuitous argument. But we are satisfied the record contains sufficient testimony and other evidence that supports the jury's causal finding unaided by any legal presumption.

DAMAGES
The jury awarded LeBlanc damages in the amount of $591,321.29, subject to a $100,000.00 credit and a reduction in accordance with the Louisiana Malpractice Act. The Fund contends this award is excessive and should be reduced.
Damage awards by a jury are entitled to great deference and should not be disturbed by a reviewing court absent a showing of a clear abuse of that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Reck v. Stevens, 373 So.2d 498 (La.1979). The initial inquiry must address the individual circumstances of each case. Id. The standard for appellate review for general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Garza v. Fontenot, 97-125 (La.App. 3 Cir. 6/4/97); 696 So.2d 194.
The record shows LeBlanc lived a healthy and happy life prior to developing exophthalmos. LeBlanc, a mother of two, was very active before her injuries. She was healthy, did not wear glasses and her eyes were normal. She testified her self perception was positive; and she was satisfied with her image. Since the onset of Grave's Disease, LeBlanc's eyes abnormally bulge from their sockets. She had difficulty closing her eyes, causing the surface to dry and ulcerate. She had double vision and developed elevated pressure in her eyes which caused secondary glaucoma. Fearing she might possibly lose her eyesight, Dr. Harper performed corrective surgery on her eyes. Both Dr. Harper and Dr. Silverberg believe LeBlanc's condition is very severe. Dr. Harper testified even after three corrective surgeries, Le-Blanc remains "significantly disfigured" because of her protruding eyes.
LeBlanc testified she is so embarrassed by her appearance, she no longer goes outside. She quit coaching her children's soccer team because of the embarrassment she felt her appearance caused them. Her husband testified she no longer takes pictures with the family.
Even after the three surgeries, LeBlanc continued to have thyroid complications. Her treating physicians recommended that she undergo radiation treatment on her eyes and thyroid gland. During the course of the treatment, LeBlanc was required to wear a lead apron and consume a radioactive solution. She was isolated from her family for seven days after the *141 radiation treatments. She had to sleep by herself, without her husband and away from her kids, use a separate bathroom, and eat in a secluded place.
LeBlanc will have to take thyroid medication for the rest of her life. She can no longer work in her profession as an x-ray technician because of the risks associated with repeated exposure to radiation.
Based on the circumstances in this case, and the testimony presented, we believe the jury did not abuse its vast discretion in awarding damages. The Fund cited several cases to show the damages are excessive; however, only after a finding that a jury abused its discretion in awarding damages can appellate courts consider other cases in deciding whether to modify an award.

DECREE
For the foregoing reasons, we affirm the trial court's judgment. All costs of this appeal are assessed to the Louisiana Patient's Compensation Fund.
AFFIRMED.